UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA     CASE NO. 19-cr-00076-01

VERSUS     CHIEF JUDGE HICKS

TRENTON J. MILLER     MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Trenton Miller ("Defendant") is charged with one count of possession with intent to distribute cocaine. The charge arises out of a traffic stop on I-20. Before the court is Defendant's Motion to Suppress (Doc. 16). For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

The testimony at an evidentiary hearing, together with the audio/video recording[1] of the traffic stop, established the following facts. On December 7, 2018, Louisiana State Police Trooper Charles Shorter was on stationary patrol on I-20 in Bossier Parish. A white Honda Accord driving eastbound approached Trooper Shorter. Trooper Shorter noticed that the car was travelling approximate 60 miles per hour in a 70-mile-per-hour zone, which was slower than the normal flow of traffic. As the car passed Trooper Shorter, he noticed

---

[1] Two audio/video recordings of the traffic stop were submitted. Defendant's Exhibit 1 is the recording from Trooper Shorter's body camera. Government's Exhibit 4 is the recording from Trooper Shorter's dash camera.

the driver "kind of sit up in his seat a little bit, and his arms were kind of locked on the steering wheel, kind of a rigid kind of posture." Tr. 3-6.

Trooper Shorter continued to watch the car and saw its tires cross the fog line on the right side of the road. Trooper Shorter followed the car for a short distance before initiating a traffic stop for improper lane usage. Tr. 7. After both cars stopped, Trooper Shorter exited his vehicle and approached the Honda. He noticed that the driver was alone in the car and that there were several snack bags in the passenger seat. Trooper Shorter identified Defendant as the driver. Tr. 9. Trooper Shorter testified that the snack bags indicated that the driver had been on the road for a long period of time. Tr. 13.

Trooper Shorter asked Defendant for his driver's license, and Defendant presented a South Carolina license. Defendant told Trooper Shorter that he lived in South Carolina and had come to Louisiana to go to the Horseshoe casino. Defendant said that he stayed in Louisiana for one day and that he was on his way back to South Carolina. Trooper Shorter found it suspicious that Defendant drove halfway across the country to stay for such a short period of time. Tr. 14-15.

Trooper Shorter asked Defendant whether he was the owner of the vehicle. Defendant said that he was not and that the vehicle belonged to "Queenie." Trooper Shorter asked for the real name of the owner, and he saw Defendant look down at the registration paperwork before answering that her name was "Gail." Trooper Shorter found it suspicious that Defendant had traveled halfway across the country in another person's car without knowing that person's real name. Tr. 16-17.

After speaking with Defendant, Trooper Shorter headed back to his patrol car. As he walked by Defendant's car, he noticed fresh smudge marks on the trunk area of the car. Tr. 17. The inconsistencies in Defendant's travel plans with normal traffic behavior led Trooper Shorter to believe that "some sort of criminal activity was happening." Tr. 19. He planned to ask Defendant for consent to search the vehicle. For officer safety, troopers always call for backup prior to requesting to search a vehicle, so Trooper Shorter contacted Sergeant George Strickland to come to the scene for back-up. Tr. 18-19.

Trooper Shorter then conducted a criminal history check of Defendant. The check showed that Defendant had been incarcerated several times, and Defendant was currently on parole on the date of the stop for trafficking cocaine. Tr. 18-19.

When Sgt. Strickland arrived on the scene, Trooper Shorter asked Defendant whether he would consent to a search of his car. Defendant said, "No, no, no," and signed a consent to search form as "refused." Tr. 20-21. Trooper Shorter told Defendant, "You got a history, bro… You got weapons history, narcotics, all that other stuff…And to be honest with you, man, it just don't make much sense that you drive all the way down here just to go to casinos for a day." Def. Exh. 1 at 14:36:00.

Because it was raining, Trooper Shorter asked Defendant if he would mind sitting in the back seat of Shorter's patrol car. Defendant was told that he could step out of the car at any time. The patrol car's door was left open. Tr. 22. Shorter testified that this was just a way for Defendant to get out of the weather. Id.

Trooper Shorter then contacted Trooper Kyle Sellers, a K-9 handler with the Criminal Patrol Unit. Tr. 22. Sellers arrived in about 10 minutes. In the meantime, Shorter

sat in the patrol car with Defendant and continued to ask him questions about his criminal history, probation status, and travel plans.

As the K-9 sniff was being conducted, Trooper Shorter could be heard explaining Defendant's travel itinerary to Sgt. Strickland.  Shorter said, "It don't make sense at all." Def. Exh. 1 at 14:45:55.

Trooper Sellers informed Trooper Shorter that the dog had indicated on the car.  Tr. 22-23.  Trooper Shorter then conducted a search of the vehicle.  He first searched the trunk area and found a suitcase that contained clothing and a camouflage bag, which contained a blue plastic bag with approximately two kilograms of suspected narcotics in it.  Tr. 23-26. Defendant was then arrested.  The total time of the stop, from when Trooper Shorter pulled Defendant over to the arrest of Defendant, was 27 minutes.

**Defendant's Motion to Suppress**

Defendant argues that Trooper Shorter unconstitutionally extended the traffic stop without reasonable suspicion until a drug sniffing K-9 could be brought to the scene. Defendant's supplemental brief also argues that Trooper Sellers' K-9 did not offer a clear alert on Defendant's car in a manner sufficient to establish probable cause to search the car.  Defendant argues that the search of his car violated the Fourth Amendment, so the evidence found should be suppressed.

**Reasonable Suspicion to Extend Stop**

    **A. Applicable Law**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v.

Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 392 Fed.Appx. 246, 250 (5th Cir. 2014); United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id. Defendant does not challenge Terry's first prong.

Under the second prong of Terry, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004)(*en banc*). "During a traffic stop, a police officer may examine a driver's license and vehicle registration, [and] run a computer check on the driver and the vehicle." United States v. Zavala, 541 F.3d 562, 576 (5th Cir. 2008). An officer "must ensure that the driver does not have a warrant or a suspended license, and that the vehicle is registered and not reported stolen. These checks are routine and quickly performed." Id. at 577.

An officer "may also ask about the purpose and itinerary of the occupant['s] trip as part of [his] investigation," because these questions are "reasonably related in scope to his investigation of the circumstances that caused the stop." United States v. Pack, 612 F.3d 341, 350 (5th Cir.), opinion modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010). Additionally, an officer may question the driver on matters unrelated to the purpose of a traffic stop, "so long as these unrelated questions do not extend the duration of the stop." Id.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." Id. The authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. Thus, although certain unrelated inquiries that do not lengthen a roadside detention are permissible, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). "In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." United States v. Santiago, 310 F.3d 336, 342 (5th Cir. 2002). Reasonable suspicion need not rise to the level of probable cause, but a "mere hunch" will not suffice. Zavala, 541 F.3d at 574.

**B. Analysis**

As mentioned, Defendant does not challenge the first Terry prong. Instead, he argues that Trooper Shorter violated the second Terry prong by unlawfully extending the traffic stop. Specifically, Defendant argues that Trooper Shorter lacked reasonable suspicion to extend the traffic stop for 10 minutes so that the K-9 could arrive. Defendant also argues that Trooper Shorter did not give adequate weight to the presence of snacks in Defendants car, which confirmed Defendant's story of a quick turn-around trip, or to

Defendant's apparent exhaustion, which Defendant contends explained his traffic violation and his referring to the car's owner by a nickname.

The Government argues that reasonable suspicion for continued detention existed based on the totality of the circumstances, including Defendant's extensive criminal history, the car being registered to a third party whose real name Defendant did not appear to remember, and Defendant's dubious travel itinerary.

In Rodriguez, the Supreme Court concluded that a K-9 search of a vehicle during a routine traffic stop is unlawful when it prolongs the stop beyond the time necessary for an officer to conduct certain inquiries and issue a ticket, *unless* reasonable suspicion of criminal activity distinct from the traffic offense is developed that is ordinarily demanded to justify detaining an individual. Rodriguez. 135 S.Ct. at 1614-1615.

Trooper Shorter had reasonable suspicion that Defendant was involved in criminal activity, and that reasonable suspicion justified the 10 minute delay while waiting for the K-9 to arrive. It is highly suspicious that a person would drive from South Carolina to Bossier City, Louisiana to stay at a casino for only one day. Trooper Shorter testified that he planned to ask Defendant for consent to search the vehicle because of "the inconsistencies in the story with normal traffic behavior, I felt as if there's some sort of criminal activity happening..." Tr. 19. Asked to clarify what he meant by "inconsistencies," he stated, "the one-day turnaround trip, the snack bags in the vehicle, him not knowing the owner's real name. . . when asked." Tr. 20. Trooper Shorter then checked Defendant's criminal history and found that Defendant "had been incarcerated several times. He has recently been arrested for – I believe it was trafficking cocaine." Tr.

18. In fact, Defendant was on parole for a drug crime at the time of the stop. Taken together, these circumstances support reasonable suspicion of criminal activity.

Citing United States v. Bell-Brayboy, 2017 WL 5078400 (W.D. La. 2017), Defendant argues that Trooper Shorter failed to investigate innocent explanations for Defendant's questionable itinerary. Defendant argues that little to no weight should be given to potentially suspicious circumstances when the law enforcement officers fail to investigate them, to prove, or disprove them. However, the Fifth Circuit has held that "[a] determination that reasonable suspicion exists. . . need not rule out the possibility of innocent conduct." United States v. Wilson, 510 Fed. Appx. 339, 344 (5th Cir. 2013). This court stated in Bell-Brayboy that "a few simple questions by Trooper Strickland *might have* dispelled his concerns about Bell-Brayboy's travel itinerary and answers to the trooper's earlier questions." Bell-Brayboy, 2017 WL 5078400 at *8. However, the court did not hold that a trooper must fully investigate all possible innocent explanations in order for reasonable suspicion to exist. Indeed, the reasonable suspicion in this case is of a different kind and character than what was offered in Bell-Brayboy.

**Probable Cause and Sufficiency of K-9 Alert**

    **A. Applicable Law**

An alert by a drug dog is sufficient to create probable cause for a search. United States v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998). Whether a dog alerts is a question of fact. United States v. Mason, 628 F.3d 123, 130 (4th Cir. 2010). The Supreme Court has explained: "The question—similar to every inquiry in probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a

reasonably prudent person think that a search would reveal contraband or evidence of a crime." Florida v. Harris, 133 S.Ct. 1050, 1058 (2013). Even if the dog is generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." Id.

There is "no Fifth Circuit law demanding that a drug dog come to a full and final alert before probable cause exists." United States v. Shen, 749 Fed. Appx. 256 (5th Cir. 2018). Furthermore, the Fifth Circuit has held that "a dog provided probable cause even though it did not sit as trained to do when alerting to narcotics" because the officer "was able to articulate several specific indicators he used, as [the dog's] handler, to interpret [the dog's] actions to be an 'alert.'" United States v. Clayton, 374 Fed. Appx. 497, 502 (5th Cir. 2010) (per curiam). The "specific indicators" identified by the handler included the dog jumping on the vehicle, elevating his ears, and pulling the handler to the vehicle. The Court stated: "So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs." Id.

### B. Analysis

Defendant argues that the K-9's conduct was ambiguous, open to the subjective interpretation of Trooper Sellers, and short of a definitive alert. Defendant argues that the dog's alert was thus was insufficient to establish probable cause to search Defendant's car.

Page 9 of 11

Like the handler in <u>Clayton</u>, Trooper Sellers identified several specific indicators that he interpreted to be an alert.[2] Those indicators including whining, backing up, and jumping up and down off the trunk. Tr. 71. The court finds that Trooper Sellers was able to articulate specific behaviors that signaled the presence of narcotics. Accordingly, probable cause existed to search Defendant's vehicle.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 16) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

---

[2] Trooper Sellers also used the term "justifiable noticeable difference" ("JND") to describe these behaviors. He testified that a JND is the same thing as an alert. However, a JND is different from a "final response," which occurs when the dog "is able to place her nose to the source" of the narcotics. His dog indicates a "final response" by sitting. Tr. 63-65.

legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 4th day of December, 2019.

Mark L. Hornsby
U.S. Magistrate Judge